UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANCINE HOLLAND,

   Petitioner,

vs.          Civil No.: 06-12721
           Crim No.: 03-50039

           Hon. Paul V. Gadola
UNITED STATES OF AMERICA,   Mag. Judge Steven D. Pepe

     Respondent.
_____/

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

Petitioner Francine E. Holland filed a "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody," on June 21, 2006, (Dkt. #65). This matter has been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons stated below it is recommended that Petitioner's § 2255 Motion be **Denied**.

### II.  FACTS AND PROCEDURAL HISTORY

Respondent relayed the following procedural history:

On July 9, 2003, Oliver Donnell Rose and Francine E. Holland were indicted for conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(ii)). Prior to jury selection, Oliver Rose pleaded guilty. (R.–Plea). Trial was held December 8, 9, 10, and 11, 2003. Defendant was found guilty with a special verdict form finding her accountable for five kilograms or more of cocaine (a special finding reflecting the intensity of the jury's view of the government's evidence). (R. 32: Verdict form and Vol. 3, 12/11/03 at Tr. 104-07) [Dkt. #31]..

1

On April 12, 2004, defendant was sentenced to 120 months incarceration followed by five years of supervised release. (R. 43: Judgment and Vol. 5, 4/12/04 at Tr. 46-48). Defendant's direct appeal was denied in Sixth Circuit number 04-1501.

Petitioner presented the following undisputed facts based on trial testimony:

The charges [in the present case] stemmed from local and federal law enforcement agencies in the Flint, Michigan area investigating a cocaine distribution conspiracy involving a host of individuals. It was discovered that Myron Jefferson operated this organization, shipping powder cocaine from Texas to Michigan. Allegedly involved with Jefferson's drug activities were Oliver Rose and Jefferson's then girlfriend, Francine Holland.

The conspiracy came to the attention of authorities when the Security Department of the united Parcel Service (UPS) contacted Flint Area Narcotics Group (FANG) and reported a suspicious package believed to contain a controlled substance, i.e. several bricks of suspected cocaine [Dkt. #53, page 25]. On April 27, 2000, a package was noticed to be damaged at the United Parcel Service (UPS) facility in Flint, Michigan. The authorities were summoned and approximately 22 kilograms of cocaine were seized. (Vol I, trial, p. 11) [Dkt. #53, page 27].

Subsequently, several controlled deliveries lead to the ultimate arrest of many individuals, including Myron Jefferson . . . Jefferson was a three time felon facing a mandatory sentence of life in prison. Because of the amount of time in prison he was facing, he cooperated with the authorities in an effort to minimize his time in prison. (Trial Vol. II, p. 10-11, 19). According to Jefferson, beginning in 1998 or 1999, Jefferson he [sic] made arrangements with Oliver Rose to help ship narcotics from Fort Worth to Flint, Michigan because Rose worked for UPS (Vol. I, p.48).

Holland was drawn into the instant conspiracy through her relationship with Jefferson. She had met Jefferson at his automobile detailing shop called Squeaky Clean [Dkt. #54, page 81]. Later, she became romantically involved with Jefferson. Jefferson eventually provided Holland with a place to live. (Trial Vol II., p.84). During their relationship, Holland had reason to believe that Jefferson had a legitimate source of income because Jefferson owned an auto detailing business and had his own record label, Iron Fist Entertainment. (Trial Vol. I, p. 46; Vol II, p. 90).

Jefferson met Holland sometime in 1998 and thereafter became romantically involved with her. (Trial Vol II, p. 24). Jefferson was married, but also kept a relationship with Holland, buying her jewelry, and providing her with a place to live. *Id.* [at 24-25, 57]. Jefferson eventually purchased a ring for Holland and Holland believed that they were engaged. (Vol II, p. 84; JA at 174). Jefferson leased a residence located at 4800 Meadowbrook Drive in Fort Worth, Texas. For Jefferson, the purpose of renting the house was to store drugs. (Vol. I, p. 57). After becoming romantically involved with Holland, Jefferson asked Holland to live at the residence. Jefferson did not pay Holland for staying in the home. (Vol I., p. 59).

Jefferson stored cocaine in an attic space at the residence that was secured by a door locked with a padlock. (Vol I, p. 60-61). According to Jefferson, approximately 50 kilograms of cocaine was stored at the location during the time Holland lived at the residence. *Id.* Jefferson had the key to the padlock; not Holland. (Vol. I., p. 62). Holland did not have access to the cocaine that Jefferson stored in the attic. (Vol. II, p. 40). Holland believed that a lock was placed on the attic door because racoons could get into the attic area. (Vol II, p. 92).

Before Jefferson's arrest, Rose traveled to Detroit to collect an outstanding drug debt. Holland accompanied Rose on the trip to Detroit. Jefferson had asked Holland to meet him in Detroit that weekend because Jefferson was going to be there to take care of his record business. (Vol. II, p. 94). Holland did not believe this was unusual because Rose and Jefferson were cousins. (Vol. II, p. 9[4]). Unbeknownst to Holland, the purpose of the trip to Detroit was for Rose to obtain approximately $350,000 form another co-conspirator, Marty Meeks. And instead of meeting Jefferson for the weekend, the purpose of having Holland travel with Rose was "to make it look good." (Vol. I, p. 72).

When Holland arrived in Detroit, she spoke with Jefferson, who told her he would not be able to make it to Detroit because he had to attend to other business. (Vol II, p. 103). Holland spent the night in Detroit alone and waited for a plane to return home to Texas. Upon getting ready to return to Texas, Holland witnessed Rose open his suitcase and transfer a large amount of cash from one suitcase to another. (Vol II, p. 108-109). Rose told Holland that the money was Jefferson's from Jefferson's record business. (Id). Holland assisted Rose in transferring the money. (Id [at 109-10]).

After returning from Detroit, Holland was contacted by DEA Agent, Bruce Osterhagen. (Trial Vol. II, p. 54). According to Ostehagen, Holland admitted that she traveled to Detroit with Rose and that Rose picked up some suitcases that contained money and returned them to Texas. (Vol. II, p. 56-57; JA at 156-157).

(Dkt. # 65, pages 1-4). Respondent included the following additional relevant facts in its recital of the trial testimony by Myron Jefferson:

Myron Jefferson had the cocaine in plain view while the defendant [Petitioner] was present at 4800 Meadowbrook. Typically, Jefferson would acquire a kilogram or two of the cocaine from the attic and prepare it for sale in the kitchen. [Dkt. #53, pages 60-62]. Sometimes, drug traffickers came to the house to acquire cocaine. Defendant helped during some of the transactions. (*Id.* at Tr. 65[-66]).

Defendant's sister, Paula, and her paramour, Kevin Shed, were drug traffickers, too. Around July 1999, Jefferson removed from the attic five kilograms of cocaine at 4800 Meadowbrook, worth approximately $17,500 each, and left it out so that it could be delivered by Holland to Shed. Shed left over $30,000 for Holland to give

to Jefferson after collecting the cocaine. Holland confirmed that she completed the transaction and provided the cash to Jefferson. (*Id.* at 66-69). Shortly thereafter, Jefferson and Holland used the same method to make a delivery of ten kilograms of cocaine to Shed at the 4800 Meadowbrook house. After doing so, Jefferson acquired the money [secured by Holland]. (*Id.* at Tr. 69-71).

(Dkt. #69, page 8). Further,

After the trip [to Detroit], Rose delivered the cash to Jefferson. However, it was only approximately $315,000. Jefferson asked Holland if she had seen Rose doing something with the money. She disclaimed any knowledge of any such event. (*Id.* at Tr. 81-82). Due to the interest of the police in the activities of the conspiracy, Jefferson told Holland to leave 4800 Meadowbrook and go to her parents' house which was nearby on the same street. (*Id.* at Tr. 78-79 and 82-85).

On July 26, 2002, Jefferson, having decided to cooperate with the police, taped a telephone conversation with Holland. (*Id.* at Tr. 85-88 and Jefferson, Vol. 2, 12/10/03 at Tr. 4-18). It included the following:

| Myron Jefferson: | Yup. Yup. Cause I, I remember home boy was saying was around, like, three dollars and fifty cents, you know what I'm saying? |
| Francine Holland: | Uh huh |
| Myron Jefferson: | But it wasn't three dollars and fifty cents. But I didn't trip, you know what I'm saying, cause I just trying to do what I can get! |
| Francine Holland: | O....kay. |

* * * * *

| Francine Holland: | Uh uh. I don't see him nowhere. But I really don't go nowhere, but you know Paula be out and she ain't seen him. |
| Myron Jefferson: | He didn't never when, when I went up there, he don't never, did you see that money? |
| Francine Holland: | Yeah, when we put in [sic] from one suitcase to the other. |

(R.—: Letter to U.S. Probation Dated December 19, 2003, attachment nine, pp. 2-3). (Dkt. #69, page 9).

## III.  STANDARD OF REVIEW

To prevail on a § 2255 motion alleging constitutional error, the petitioner must establish an error of constitutional magnitude, which had a substantial and injurious effect of influence on the proceedings.  *Brecht v. Abrahamson*, 507 U.S. 619, 637-638 (1993).  To prevail on a § 2255 motion alleging non-constitutional error, the petitioner must establish a "fundamental defect which inherently results in a complete miscarriage of justice, or, an error so egregious that it amounts to a violation of due process."  *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (citing *Hill v. United States*, 368 U.S. 424, 428 (1962)).  Section 2255 requires that a district court hold an evidentiary hearing to determine the issues and make findings of fact and conclusions of law regarding the petitioner's case "unless the motion and the file records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255; *see also Green v. United States*, 65 F.3d 546, 548 (6th Cir. 1995).  As the analysis will show, Petitioner is entitled to no relief; thus, an evidentiary hearing is not necessary.

## IV.  ANALYSIS

Petitioner alleges one claim of ineffective assistance of counsel in her motion.[1]  Her claim is properly before this court, even though it was not raised on direct appeal.  "Ineffective assistance of counsel claims are best brought by a defendant in a post-conviction proceeding

---

[1]The Government also points out that Petitioner made "miscellaneous complaints about her lawyer," and lists these (Dkt. #69, pages 19-21).  Petitioner concedes that these complaints do not rise to the level of ineffective assistance of counsel (Dkt. #70, page 5 ("Holland did not assert in her petitioner that her complaints about prior counsel amount to ineffective assistance of counsel. Holland merely provided this information to the court because it provides a context for this court to view her claims of ineffective assistance of counsel.")); therefore, these complaints will not be analyzed in this Report and Recommendation (*See also* Dkt. #65, page 12).

5

under 28 U.S.C. § 2255 so that the parties can develop an adequate record on the issue." *United States v. Foster*, 376 F.3d 577, 593 (6th Cir. 2004) (quoting *United States v. Daniel*, 956 F.2d 540, 543 (6th Cir.1992); *see also Massaro v. United States*, 538 U.S. 500 (2003) (ineffective-assistance-of-counsel claims may and should be brought in 28 U.S.C. § 2255 proceeding)). Therefore, this Court will address Petitioner's claims regarding ineffective assistance of trial and appellate counsel.

To show that he was denied the effective assistance of counsel under federal constitutional standards,

> [f]irst, defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Nonetheless, Petitioner "cannot use a § 2255 proceeding, in the guise of ineffective assistance of counsel, to relitigate issues decided adversely to him on direct appeal." *Clemons v. United States*, 2005 WL 2416995, at *2 (E.D. Tenn. 2005) (citing, *see e.g.*, *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir.1996).

In evaluating alleged prejudice resulting from ineffective assistance of counsel, "[i]t is not enough . . . to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Indeed, "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* (citation omitted). Rather, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The standard to be applied is not that of a hypothetical perfect counsel, but that of reasonably effective counsel under prevailing professional norms.  *Strickland*, 466 U.S. at 687-88.  The fundamental test of effective assistance of counsel is whether counsel "bring[s] to bear such skill and knowledge as will render the trial a reliable adversarial testing process."  *Id.*

When evaluating counsel's performance under the *Strickland* test, the Sixth Circuit has emphasized that "[a] reviewing court must give a highly deferential scrutiny to counsel's performance. . ."  *Ward v. United States*, 995 F.2d 1317, 1321 (6th Cir. 1993).  This is based on the well-established principle that legal counsel is presumed competent.  *United States v. Osterbrock*, 891 F.2d 1216, 1220 (6th Cir. 1989).  As the Court in *Strickland* stressed:

> it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

466 U.S. at 689.

"The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential."  *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986).  A fair assessment of  Petitioner's counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, so as to reconstruct the circumstances of his challenged

conduct, and to evaluate the conduct from his perspective at the time. *Stickland*, 466 U.S. at

689. Federal court review presumes that an attorney "is competent, and therefore, 'the burden

rests on the accused to demonstrate a constitutional violation.'" *United States v. Pierce*, 62 F.3d

818, 833 (6th Cir. 1995) (quoting *United States v. Cronic*, 466 U.S. 648, 658 (1984)).

**Cross Examination of Bruce Osterhagen**

Petitioner's main claim is that the cross-examination of Bruce Osterhagen by trial

counsel resulted in the only information the jury heard connecting Petitioner to the conspiracy.

During her trial the following discussion occurred beginning with defense counsel's questions to

Agent Osterhagen[2]:

> Q: Again I'm going to show you - - Agent Osterhagen, I'm going to show you Page 23 of the Grand Jury transcript. And again you were testifying under oath in regards to what you learned of Francine Holland's role in this transaction through Mr. Jefferson, isn't that correct?
>
> A: Yes.
>
> Q: And again the question that was asked of you is, what did Jefferson say was her role in that regard? That was the question. And I realize I'm repeating myself. And then you gave an answer, right?
>
> A: Yes.
>
> Q: And the answer was, there will be occasions where Myron Jefferson would be in Flint when he would get a phone call from someone in Fort Worth, Texas wanting a large amount of cocaine like and he would in turn call Francine Holland and say, this person was coming over to pick up a kilo, just sell it to him. That was part of your answer, right?
>
> A: Yes.
>
> Q: Then you further said, and she knew where the location was in the upstairs bedroom where the cocaine was kept, correct?
>
> A: Yes.
>
> Q: And - - and in fact she would go get it and do the transaction while Myron

---

[2]Previously, Jefferson had testified that Petitioner had no access to the attic where the cocaine was stored (Dkt. #54, page 40).

8

was not there. That was your testimony, correct?

A:      Yes.

Q:      And he indicated to you that she had access to the attic, correct? Or places where they get cocaine.

MR. JONES:      Judge, objection. It does not say that. That's a complete fabrication.

MR. MEGDELL:      I'm sorry.

MR. JONES:      I object to this, this is an improper effort at impeachment, Your Honor.

THE COURT:      Well, I just looked at it. It says that – that she would go and get the kilo, does that indicate that she had access to it?

MR. MEGDELL:      Yes.

THE COURT:      Okay. Mr. Jones, I don't know why you're objecting. I don't think this is at all helpful to the defendant frankly.

MR. JONES:      Well, I understand, Your Honor, but he's throwing in the word attic and that doesn't say that and that's not fair to the Government's standpoint. It doesn't say attic.

THE COURT:      Well, whether it's attic or not, but it does say that Mr. Jefferson (sic) testified before the Grand Jury that the defendant would go get the cocaine.

MR. JONES:      No, Your Honor - -

THE COURT:      Again, I don't know why counsel wants to pursue this frankly. And I don't know - - and I don't know why you're objecting frankly. I don't know why either one of you are doing what you're doing here.

MR. MEGDELL:      Can we approach the bench, please?

THE COURT:      No. Go ahead.

Q:      And then Mr. - - Agent Osterhagen, you - -

MR. MEGDELL:      One second, Your Honor, please. Judge, can we take a five minute break here?

THE COURT:      Pardon me?

MR. MEGDELL:      Five minutes break.

THE COURT:      Well, we can take a recess in a few minutes, but - -

MR. MEGDELL:      I'm looking for something, Judge.

THE COURT:      All right. We'll take our midday recess at this point, ladies and gentlemen. You may retire to the jury room and we'll take about a 15 minute - - 15, 20 minute recess.

THE CLERK:        All rise for the jury.

(Jury Out at 10:52 a.m.)

(Dkt. #54, at pages 68-71).  Once the jury was out of the courtroom, the following motion was

made for mistrial:

MR. MEGDELL:        Judge, I, at this time, when we started this case, you
                    mentioned to the jury - - you mentioned to the jury that you
                    would not comment on the evidence. You very rarely do that.
                    Well, the purpose of the cross - - of my questioning of Agent
                    Osterhagen was to - - I showed that the testimony of Jefferson
                    was inconsistent to the effect that Francine Holland had no
                    access to the attic, no access to the attic.

THE COURT:          Why didn't you ask him that?

MR. MEGDELL:        I did.

THE COURT:          Jefferson?

MR. MEGDELL:        Yeah, I asked Jefferson that. And he said no.  I asked him that
                    question, he said no. And - -

THE COURT:          He said she had no access.

MR. MEGDELL:        To the attic.

THE COURT:          To the narcotics in the attic.

MR. MEGDELL:        He had a - -

THE COURT:          Well, again, I just - - I just wonder why - - why you're now -
                    - you're now asking Agent Osterhagen to - - to testify here to
                    that Jefferson said yes, she did have access to the narcotics.

MR. MEGDELL:        Because it's inconsistent. I think it's inconsistent and I think
                    that - -

THE COURT:          You've lost me, Mr. Megdell, as to your strategy.

MR. MEGDELL:        I'm asking for a mistrial.

THE COURT:          No, you're not getting mistrial.

MR. MEGDELL:        Thank you.

(Dkt. #54, pages 74-75).  A curative instruction was then discussed still outside the presence of

the jury:

10

MR. JONES:   I take it counsel does not wish to have a curative instruction if indeed - - I don't believe that there's any damage to this. I think it's a tempest in a teapot.

But for purposes of the record from a legal standpoint, if counsel is objecting there should always be an opportunity for counsel to propose what he viewed to be a curative instruction. I take it he doesn't wish the Court to make any instruction and I'd be happy to write out a proposed instruction if in fact he thinks there's some damage in that regard. I'd be happy to listen to what he had to say, but I don't - - again, I disagree that there's been any damage relative to this. The jury has been instructed repeatedly that they are to decide the facts and I'm sure that's very clear to them at this point in time.

THE COURT:   Counsel?

MR. MEGDELL:   I don't know how a curative instruction is going to take away from what the Court said.

(Dkt. #54, at Tr. 76-77).

Nonetheless, the court gave the following curative instruction after the jury returned:

THE COURT:   Ladies and gentlemen, before we get underway, before the recess I made a - - some comment regarding what I believed to be the testimony by Myron Jefferson before the Grand Jury that was referred to in - - in the - - in the transcript that was shown to Mr. Osterhagen.
I am informed that I was mistaken on that. The - - the - - the comments that were made by Mr. Jefferson to - - were not in any Grand Jury testimony he gave, they were in a conference or a conversation between himself and Agent Osterhagen, is that correct, sir?

THE WITNESS:   Yes, sir, it is.

THE COURT:   All right. And I also became a little bit frustrated over what I - - what I consider to be a - - problem here and I expressed some critical remark about counsel, both for the defendant and the Government. And I'm telling you right now that I probably shouldn't have said that and I'm asking you - - telling you that you should totally disregard those comments that I made. All right, let's resume.

(Dkt. #54, at pages 79-80). The court gave the following jury instruction prior to deliberations:

> The evidence in this case includes only what the witnesses said while they were testifying under oath, and the exhibits that I allowed into evidence. Nothing else is evidence.
> The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. And my comments and questions are not evidence.

(Dkt. #55, at page 78). The court also stated the following as part of the jury instructions: "Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You decide for yourselves if the Government has proved the defendant guilty beyond a reasonable doubt." (Dkt. #55, page 97).

## Conspiracy

Petitioner claims that the testimony elicited on cross examination of Bruce Osterhagen is the only evidence that actually shows that Petitioner was involved in the conspiracy. Thus, Petitioner's argument is essentially that but for defense counsel's cross examination of Bruce Osterhagen, the jury would not have convicted her on the conspiracy charge. Petitioner argues:

> This testimony proved to be more damaging than the testimony offered by the prosecution's key witness and the leader of this vast drug conspiracy, Myron Jefferson. Although Jefferson testified at trial that Holland was aware of his drug dealing and had been present when drugs had been picked up and paid for by Jefferson's co-conspirator, Kevin Shed (Vol. I, p. 67-70), no testimony or evidence was offered by the government indicating that Holland over assisted Jefferson with his drug business in any way or furthered the drug conspiracy ion [sic] any way.

(Dkt. #65, page 12). An examination of what is required to prove conspiracy and whether evidence, other than that testimony elicited on cross-examination of Bruce Osterhagen, shows

evidence of Petitioner's involvement in the conspiracy sufficient for her conviction of that offense.

> In order to establish a drug conspiracy pursuant to 21 U.S.C. § 846, the government must prove "that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it." *United States v. Christian*, 786 F.2d 203, 211 (6th Cir.1986). A trier of fact may infer knowledge of and participation in the common purpose and plan of a conspiracy based on defendant's actions and reactions to the circumstances. Id. (citing *United States v. Garcia*, 655 F.2d 59 (5th Cir.1981)). The government may demonstrate that a defendant had the requisite knowledge by showing that defendant knew the essential object of the conspiracy. The government need not show that a defendant participated in all aspects of the conspiracy; it need only prove that defendant was a party to the general conspiratorial agreement. Id. Further, "[t]he connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." Id. (quoting *United States v. Batimana*, 623 F.2d 1366 (9th Cir.), cert. denied, 449 U.S. 1038, 101 S. Ct. 617, 66 L. Ed.2d 500 (1980)).

*United States v. Barrett*, 933 F.2d 355, 359 (6th Cir. 1991). More specifically,

> The essential elements of conspiracy under 21 U.S.C. § 846 are (1) an agreement by two or more persons to violate the drug laws, and (2) knowledge of, intention to join, and participation in the conspiracy on the part of each conspirator. *See United States v. Elder*, 90 F.3d 1110, 1120 (6th Cir.), cert. denied, --- U.S. ----, ----, 117 S.Ct. 529, 993, 136 L.Ed.2d 415, 873 (1996). Edward's challenge is directed to the second prong of the conspiracy elements.

> The judicial iterations in conspiracy cases of the black-letter law concerning the manner in which a conspiracy may be proved are so familiar and have been repeated so often as to have become a virtual mantra. But we hesitate to omit them here, lest some unwritten rule of judicial review be offended. Hence:

>> " 'Proof of knowledge is satisfied by proof that the defendant knew the essential object of the conspiracy.... Every member of a conspiracy need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement.' "

> *United States v. Hernandez*, 31 F.3d 354, 358 (6th Cir.1994) (citation omitted). " ' "Participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances." ' " *Id.* (citation omitted). However, " '[m]ere presence at the crime scene is insufficient' " to show participation. *Id.* (citation omitted). And " ' "[t]he connection of the defendant to the

conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." ' " *Id.* (citation omitted). "It is ... not necessary for the government to prove the existence of a formal agreement; evidence of a tacit agreement or mutual understanding is sufficient to demonstrate a conspiracy." *United States v. Lloyd*, 10 F.3d 1197, 1210 (6th Cir.1993). And

> [o]nce the conspiracy itself has been proven to exist, it is not necessary to show that a defendant knew every member of the conspiracy or knew the full extent of the enterprise. Such evidence can be inferred from the interdependence of the enterprise.

*Id.* (citation omitted).

*United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998).

Petitioner argues that the evidence at trial, viewed in the light most favorable to the Government, showed that

> (1) Holland and Jefferson were romantically involved,
>
> (2) Holland knew or should have known that Jefferson sold drugs,
>
> (3) Holland lived in one of Jefferson's residences,
>
> (4) cocaine was stored at that residence but Holland did not have access to it, and
>
> (5) Holland accompanied Rose to Detroit and witnessed him with money and assisted him in counting it.

(Dkt. #65, page 17). Yet, this litany ignores Petitioner's own concession that Myron Jefferson testified at trial that Holland was aware of his drug dealing and had been present on about ten occasions when he got drugs from the attic and cooked some up with Petitioner cleaning up or packaging it for someone to pick up (Dkt. #53, pages 61-63). On one occasion in July 1999, when Jefferson was away he left five kilos of cocaine with Petitioner to be picked up and paid for by Jefferson's co-conspirator, Kevin Shed. *Id.* at 65-69. Jefferson said that about a week

before she gave him the "thirtysome thousand" dollars Shed had paid for the cocaine.[3] *Id.* at 69.

---

[3]Q:    All right.  In addition to what you've mentioned, were there - - was there any occasions where persons came over there to 4800 North Meadow (sic) to get cocaine which Francine helped that person get?

A:    Yes, sir.

Q:    Okay.  Can you explain when that was approximately?

A:    I don't know the exact date or anything, but I know that Kevin Shed came over and - -

*****

Q:    All right.  Now you have in front of you, Mr. Jefferson, the rental period there, that Exhibit 40.  It shows the dates.  It shows the time frame of approximately April '99 through April '00.  Along that sequence of events there, do you recall approximately when it was that Francine helped Shed get the cocaine?

A:    It might have - - to my knowledge around July.

Q:    Of which year then, sir?

A:    It's '99.

Q:    All right.  Can you describe what happened, please?

A:    I mean there was a time where I wasn't - - well, we knew him, we knew Kevin Shed, so I just left the drugs out where she could give it to him.  And then when he got the money or whatever later on, or half the money, he would come back and give her - -

MR. MEGDELL:    Objection, Your Honor, That's hearsay and there's no foundation for that.

THE COURT:    I didn't really catch the answer.

MR. JONES:    Well, I'm not sure I agree, but I'll go a little slower there.

THE COURT:    Restate your question.

MR. JONES:    Yes, Your Honor.

Q:    You physically left some cocaine out, is that right?

A:    Yes, sir.

Q:    All right.  Did Francine know Shed?

A:    Yes, sir.

Q:    How did she know him from your knowledge of the matter?

A:    Her sister was dating Shed.

Q:    All right.  And was - - are you familiar with whether or not her sister was involved in drug trafficking.

A:    Oh, she was.

Q:    I beg your pardon?

A:    She was.

Q:    Okay.  And how do you know that?

A:    Because there was a - - there was another sting that we did as far as with the DEA with her involved.

Jefferson testified that this same drug sale procedure with Petitioner and Shed happened on one

        Q:     All right.  You were cooperating against Francine's sister, is that right?

        A:     Yes, sir.

        Q:     All right.  And what was it that you did relative to her?

        A:     Sold her 200 - - well, it's 240 some grams of cocaine.

        Q:     All right.  And do you recall when that was approximately, Mr. Jefferson>

        A:     It was in the summer time of not this summer, but last summer.

        Q:     Okay.  And then what was Shed's relationship with the sister?

        A:     With Francine's sister?

        Q:     Yes, sir.

        A:     They were dating or going together.

        Q:     All right.  What's Francine's sister's names, please?

        A:     Paula.

        Q:     Beg your pardon?

        A:     Paula.

        Q:     Paula, okay.  And you left the cocaine out with some instructions or some comments, or what was the situation? What did you say to Francine relative to that cocaine that was left out for Shed?

        A:     Well, I had talked to him and he knew that to come by there and I had left the kilos with her to pick up.

        Q:     All right.  Did you explain that to her?

        A:     I said, well, I'm leaving this here for Kevin to pick up.

        Q:     Okay.  And how much - - how many kilos was it?

        A:     Five.

        Q:     Okay.  Approximately how much was that worth at that point?

        A:     I mean it was 17,500 - - I mean 17,500 apiece.

        Q:     All right.  Times five then, right?

        A:     Right.

        Q:     Had you taken care of the financial arraignments beforehand?

        A:     Well, later on when I talked to him, if there was any money, if he had any money or if he had like some of the payment he would - - I would tell him well just drop it off with her.

        Q:     Okay.  Did in fact she confirm it happened later?

        A:     Yes.

        Q:     All right.  How much money did she (sic) leave with Francine?

        A:     It was like thirty some thousand at first.

        Q:     All right.  Did she in fact turn that over to you?

        A:     Yes.

        Q:     Okay.  Do you recall when that was relative to the transaction which you estimated to be in July '99?

        A:     I mean I don't recall the exact date, but I'm sure it was like maybe a week later.

*Id.* at 65-69.

other occasion before.[4]  *Id.* at 69-71.  Petitioner alleges that given this evidence, there is a lack of

"tacit coordination" as required by *United States v. Braggs*, 23 F.3d 1047, 1051 (6th Cir. 1994).

Petitioner alleges that the Government did not elicit testimony regarding her involvement when

drugs were picked up and paid for at the rental house, but the record shows otherwise.

---

[4]Q:  All right.  Were there other occasions where Francine helped her sister's boyfriend relative to cocaine?

A:  I mean I don't - - I don't have any knowledge f her actually helping him, you know, all the time, but if I needed her to do anything she would do it.

Q:  All right.  Did you in fact ask her to do anything else to help Shed out?

A:  I don't understand the question.

Q:  All right.  Were there other occasions where Shed received cocaine from 4800 Meadowbrook, or was this the only occasion while Francine was staying there?

A:  It was maybe one other occasion.

Q:  All right.  Would that have been before to after this other one which you estimate as being July '99?

A:  After.

Q:  Okay.  Would you describe what happened relative to that, Mr. Jefferson, please?

A:  I just left the same procedure.  Because I mean after he bring the money, you know, after she pick up the money from him or he bring the money to her, then I would have come by and get the money which would leave him to where he needs some more, so I have to leave it again.

Q:  Okay.  Do you recall how many kilos were invovled on this occasion?

A:  Ten.

Q:  All right.  And how many were on the first occasion to the best of your - -

A:  Five.

Q:  All right.  So we have five and ten kilos, is that right?

A:  Right.

Q:  Okay.  Did - - did she collect the money on this occasion for you or not?

A:  On the - -

Q:  I beg your pardon?

A:  On the last one?

Q:  Yes, sir.

A:  I might have picked - - I picked that up, I know that,

Q:  All right.  Do you recall approximately how long it was after the first occasion that the second delivery was made to Shed with Francine's help?

A:  It was probably maybe a few weeks from that.

*Id.* at 69-71.

Petitioner's presence when drugs were out in the open and when Jefferson would get them from the attic for pick up or cooking may be insufficient to prove participation in a conspiracy.[5] But her later direct involvement in sales to Shed would suffice to prove Petitioner's involvement in the conspiracy.[6] In *Braggs*, as the Sixth Circuit explained:

> Mere presence is not enough to connect a person to a conspiracy. *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir.1990), cert. denied, 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991). ***However***, once the existence of a conspiracy was established, only ***slight evidence*** was needed to connect McCrary to it, if there was sufficient evidence to establish the connection beyond a reasonable doubt. *See United States v. Betancourt*, 838 F.2d 168, 174 (6th Cir.), cert. denied, 486 U.S. 1013, 108 S.Ct. 1748, 100 L.Ed.2d 210 (1988); *see also United States v. Barrett*, 933 F.2d 355, 359 (6th Cir.1991); *United States v. Christian*, 786 F.2d 203, 211 (6th Cir.1986). Starks testified that McCrary was present when Braggs and Clemmons cut the crack into smaller pieces earlier that day. Police officers later recovered more than 44 "rocks" of crack from McCrary's person. This certainly constitutes "firm evidence of at least tacit coordination among conspirators." *Pearce*, 912 F.2d at 162. Therefore, McCrary's conspiracy conviction is supported by sufficient evidence.

---

[5]"[M]ere presence" or "mere association" with coconspirators is insufficient evidence of agreement. *See, e.g., United States v. Pearce,* 912 F.2d 159 (6th Cir.1990) (mere presence in crack house insufficient to establish conspiracy), *cert. denied,* 498 U.S. 1093 (1991); *United States v. Stanley,* 765 F.2d 1224 (5th Cir.1985) (mere presence and prior contact with coconspirators is insufficient); *United States v. Hernandez,* 896 F.2d 513 (11th Cir.) (acting suspiciously and being passenger in car with alleged coconspirator is insufficient), *cert. denied,* 498 U.S. 858 (1990). *United States v. White*, 19 F.3d 20, 1994 WL 70855, at *8 (6th Cir. 1994).

[6]A difference exists between the cases cited by Piekos and the instant case. In the cited cases, there was no evidence (other than presence) that the defendant did anything illegal or in furtherance of the conspiracy; the defendant was simply found with a coconspirator. In the instant case, however, if the jury believed (which it clearly did) the evidence presented by the government, that evidence established that Piekos transported the drug supply and gave it to Smith to deliver. This evidence would establish a clear knowledge of and intent to promote the conspiracy, not the equivocal fact of friendship with a coconspirator or mere presence at the scene of a crime. *White*, 19 F.3d 20, 1994 WL 70855, at *8.

*Braggs*, 23 F.3d at 1051 -1052 (emphasis added).  The Government argues

> that the defendant engaged in several overt acts. Further, defendant admits that testimony was offered [by Jefferson (Dkt. #53, pages 67-70)] that she knew about the drug trafficking; stored cocaine in her house (denying she had access to it); was present while drug dealer Kevin Shed picked-up cocaine at her house [according to Jefferson's testimony]; and helped acquire money from Detroit.  Pages 4-5 and 12 of her brief. Claiming that such contributions did not assist the large-scale cocaine conspiracy (p. 4) stretches the limits of reasoning.

(Dkt. #69, page 5).  Yet, the argument for the Government is even stronger when adding the testimony by Myron Jefferson that Petitioner was directly involved in the drug dealing. Notwithstanding the testimony that she thought the money was related to the record business and not the drug business, taking the evidence as a whole, a jury could reasonably conclude that she was not credible and the testimony of Myron Jefferson, self serving or not, was enough to convict her on the conspiracy charge.

In the present case, Petitioner argues that she thought the monetary transaction she was involved in was related to her boyfriend's record business.  Yet, as in *White*, even though the transaction could be interpreted as related to a legal transactions, it could also establish sufficient evidence that it was part of an illegal transaction, which would be enough to convict her Petitioner of membership in the conspiracy.

All of this evidence is separate and independent of the cross-examination of Bruce Osterhagen relating to her access to the attic solicited by counsel.[7]  Thus, even if defense

---

[7]The Government also attacked Petitioner's credibility because she initially told law enforcement that she did not she the money in the suitcase until she returned to Texas (Dkt. #54, page 60).  Yet, she later changed that story and on direct examination, she described the transfer of money happening in Detroit.  *Id.* at 108.  Additionally, as to Petitioner's credibility, the Government points out (all of which has been verified by the references to testimony in the record):

counsel's actions were unreasonable and satisfy the first prong of *Strickland*, the second prong is not satisfied because the Osterhagen testimony was cumulative of other direct evidence and not prejudicial. In light of Myron Jefferson's testimony of her knowledge of his drug dealing, his testimony regarding her role in drug transactions with Kevin Shed, and her role in the trip to Detroit, Petitioner has not demonstrated that but for the cross-examination of Osterhagen, there was a reasonable probability that she would not have been convicted. Additionally, the jury could have reasonably rejected her explanations cited above and found her not to be credible. Thus, Petitioner fails to establish a viable claim for ineffective assistance of counsel based on the other evidence of her involvement in the conspiracy.

## V.    CONCLUSION

Based on the foregoing, it is respectfully recommended that Petitioner's § 2255 Motion be **DENIED**.

---

On cross-examination (Holland, Vol. 2, 12/10/03 at Tr. 115-42), the defendant attempted to explain why she did not have legitimate identification when she registered at the hotels in Michigan (*Id.* at Tr. 115-20 and 95-102) . . . explained that legitimate business people regularly paid for everything in cash; explained that she did not use checks (*Id.* at Tr. 128-29); explained that she thought it was normal to use a two-inch padlock on an attic door to prevent rodents from entering the house (*Id.* at Tr. 129-33); stated that Agent Osterhagen was wrong when he testified that she told him that she knew Jefferson was a drug dealer and that she did not see the cash until she returned to Texas (*Id.* at Tr. 133-38); explained that it was not unusual for her to have flown and returned to another state with Oliver Rose when her purported purpose was to have a romantic liaison with Jefferson (*Id.* at 137-39); explained that she had been readily employed during the last few years despite government records to the contrary (*Id.* at Tr. 139-40); and stated that she did not know that her sister, Paula, and Paula's paramour, Kevin Shed, were pending on an indictment for cocaine trafficking (*Id.* at Tr. 140-41).

(Dkt. #69, pages 11-12).

Pursuant to Rule 72(b) of the Fed. R. Civ. P. and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of this recommendation they may serve and file specific, written objections to the proposed findings and recommendations. Either party may respond to another party's objections within ten days after being served with a copy thereof. The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed. R. Civ. P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.

**DATED**: June 27, 2007                                   s/Steven D. Pepe

Flint, Michigan                                              United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that on <u>June 27, 2007</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Mark C. Jones</u>, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Francine E. Holland, #30411-177, FMC Carswell, P. O. Box 27137, Fort Worth, TX 76127</u>.

s/James P. Peltier

United States District Court

Flint, Michigan 48502

810-341-7850

E-mail: pete_peltier@mied.uscourts.gov